# COURT OF APPEALS
## DECISION
## DATED AND FILED

## December 19, 2019

**Sheila T. Reiff**
**Clerk of Court of Appeals**

## NOTICE

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2019AP1004**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018JV439

**IN COURT OF APPEALS**
**DISTRICT IV**

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

S. E. M. T.,

DEFENDANT-APPELLANT.

---

APPEAL from orders of the circuit court for Dane County:  JULIE GENOVESE, Judge.  *Affirmed.*

¶1    BLANCHARD, J.[1]   S.E.M.T. appeals two orders waiving juvenile court jurisdiction over him, sending him to adult court to face charges that include

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

first degree sexual assault and armed robbery.[2] S.E.M.T. argues that the circuit court erroneously exercised its discretion in making its waiver decision based on the following determinations: (1) that S.E.M.T. would likely have the benefit of a longer period of appropriate treatment in the adult system than would be available to him in the juvenile system and (2) that the alleged conduct by S.E.M.T. appears to have been premeditated, despite the fact that the court also found that S.E.M.T. has an intelligence quotient (IQ) measured at 63. I disagree that the court erroneously exercised its discretion and accordingly affirm.

## BACKGROUND

¶2 The State filed an initial delinquency petition on September 4, 2018, charging then 16-year-old S.E.M.T. with identity theft and obstructing an officer. The State alleged that he had withdrawn money from a cash machine using a stolen debit card. The card had just been taken, on September 1, 2018, from a woman by someone who also sexually assaulted her. This petition did not allege that S.E.M.T. had committed the sexual assault.

¶3 However, in a subsequent delinquency petition, filed on September 11, 2018, the State charged S.E.M.T. with three counts of first degree sexual assault, and one count each of armed robbery, burglary, and felony intimidation of a victim. The State alleged that, in the early morning hours of September 1, 2018, S.E.M.T. had entered the residence of an adult woman without her permission, brandished a stick, used threats of death, and sexually assaulted the woman multiple times. In addition, he allegedly took money from her and a

---

[2] This court granted leave to appeal from the non-final waiver orders. *See* WIS. STAT. RULE 809.50(3).

debit card, demanding that she give him the personal identification number for the card. This petition also alleged that S.E.M.T. had made highly incriminating admissions to police investigating the sexual assaults.

¶4 The State petitioned the court for a waiver of juvenile court jurisdiction in both cases. In support, the State stated that S.E.M.T. would turn 17 in July 2019 and argued that the available juvenile court dispositions would "not provide an adequate length of time for intervention." The petitions listed extensive prior dispositions that S.E.M.T. had received in juvenile court and alleged that his "motives and attitudes are closer to those of an adult than a juvenile."

¶5 S.E.M.T. opposed the petitions and the circuit court held a waiver hearing over the course of four days in February, March, and May 2019, with the court hearing from ten witnesses. Summarizing the State's primary arguments at the close of evidence, the State emphasized the seriousness of the offenses, arguing that the evidence showed that S.E.M.T.: was familiar with the victim, a middle aged woman, before the offenses; "targeted" her for multiple, violent sexual assaults; and showed "no remorse or empathy" at times after the offenses. The State further noted that, at the time of these serious offenses, S.E.M.T. had six pending cases, including felonies, and was in a home detention program. The prosecutor argued, "I don't believe the juvenile system can protect [S.E.M.T.] from himself and I certainly don't believe the juvenile system at this time can protect the public" from S.E.M.T.

¶6 Summarizing the primary arguments of counsel for S.E.M.T., counsel emphasized that S.E.M.T. suffered from "a very complex raft of significant deficits," including having the cognitive age of fourth grader, and

contended that the conduct here, while serious, was "the product of a lot of different injuries [to S.E.M.T.] that need a lot of attention." Counsel also highlighted S.E.M.T.'s good behavior while detained, because "he has done well" within the confines of the Juvenile Reception Center, "with consistency of rules and the attention of adults who are trying to work with him." Counsel argued that the State was unfairly trying to paint S.E.M.T. as "a budding little sociopath." The evidence did not support a finding of "criminal sophistication," but if he were convicted and sentenced in the adult system, he would inappropriately end up surrounded by sophisticated criminals.

¶7 As discussed in more detail below, related to the two specific arguments raised on appeal, the court granted the State's waiver petitions.

## DISCUSSION

### I. Legal Standards

¶8 Appellate courts affirm a circuit court's decision to waive a juvenile into adult court unless the court erroneously exercised its discretion. *State v. Tyler T.*, 2012 WI 52, ¶24, 341 Wis. 2d 1, 814 N.W.2d 192. "A juvenile court erroneously exercises its discretion if it fails to carefully delineate the relevant facts or reasons motivating its decision or if it renders a decision not reasonably supported by the facts of record." *Id.* I am to look for reasons to uphold the court's waiver decision, *id.*, and will reverse it "if and only if the record does not reflect a reasonable basis for the determination or a statement of the relevant facts or reasons motivating the determination is not carefully delineated in the record." *J.A.L. v. State*, 162 Wis. 2d 940, 961, 471 N.W.2d 493 (1991).

¶9 A circuit court addressing a waiver petition is to consider, as pertinent here:

> (a) The personality of the juvenile, including whether the juvenile has a mental illness or developmental disability, the juvenile's physical and mental maturity, and the juvenile's pattern of living, prior treatment history, and apparent potential for responding to future treatment.
>
> (am) The prior record of the juvenile, including whether the court has previously waived its jurisdiction over the juvenile, whether the juvenile has been previously convicted following a waiver of the court's jurisdiction or has been previously found delinquent, whether such conviction or delinquency involved the infliction of serious bodily injury, the juvenile's motives and attitudes, and the juvenile's prior offenses.
>
> (b) The type and seriousness of the offense, including whether it was against persons or property and the extent to which it was committed in a violent, aggressive, premeditated or willful manner.
>
> (c) The adequacy and suitability of facilities, services and procedures available for treatment of the juvenile and protection of the public within the juvenile justice system, and, where applicable, the mental health system and the suitability of the juvenile for placement in the serious juvenile offender program ... or the adult intensive sanctions program ....

WIS. STAT. § 938.18(5). It is within the circuit court's discretion how much weight to give each factor. *G.B.K. v. State*, 126 Wis. 2d 253, 259, 376 N.W.2d 385 (Ct. App. 1985).

¶10 In order to waive a juvenile into adult court, the circuit court must conclude that the evidence establishes, to a "clear and convincing" degree, that "it is contrary to the best interests of the juvenile or of the public" for the case to proceed in juvenile court. WIS. STAT. § 938.18(6).

**II.    Analysis**

¶11    S.E.M.T. argues that the circuit court erroneously exercised its discretion in two specific ways, with some sub-arguments.  I address each major argument in turn.

**A.  Comparative Availability Of Treatment**

¶12    S.E.M.T.'s first argument primarily rests on WIS. STAT. § 938.18(5)(c), which, to repeat, directs the court to consider "[t]he adequacy and suitability of facilities, services and procedures available for treatment of the juvenile and protection of the public within the juvenile justice system, and, where applicable, the mental health system and the suitability of the juvenile for placement in the serious juvenile offender program ... or the adult intensive sanctions program ...."

¶13    With the WIS. STAT. § 938.18(5)(c) subset of factors as context, particularly the "adequacy and suitability of" potentially available "treatment," S.E.M.T. makes the following argument.  The circuit court relied on an inaccurate understanding of the facts and concluded that S.E.M.T. would likely have the benefit of a longer period of appropriate treatment in the adult system than would be available to him in the juvenile system.  This breaks down into three sub-arguments:   (1) that the court rested its decision on a misunderstanding that S.E.M.T.'s proposed treatment at a particular out-of-state residential treatment program for juveniles (Youth Villages in Tennessee) would last no longer than 10 months; (2) that the court mistakenly thought that placement in Youth Villages could be under a juvenile order limited to only one year in length; and (3) that the court had no basis to think that any treatment S.E.M.T. would receive in the adult

system would be more effective than treatment he would receive in the juvenile system.

¶14     With that background, I now quote what the court said in explaining this aspect of its waiver decision:

> So then the final factor and the one that I've been really focused on is the adequacy and suitability of facilities, services in the juvenile system and whether placement in [the] Serious Juvenile Offender Program[] is appropriate.
>
> And so I was really thinking maybe there would be a place out in the country that could provide the services that would be necessary to deal with [S.E.M.T.'s] issues[.] You know there are the trauma things, there are the cognitive issues, but this sexual paraphilia and how do you treat that?  I was not convinced at all that Youth Villages is going to be able to[,] in four to ten months[,] address this issue.  And if I were to do that, then [the prosecutor is] right, it would be a one-year supervision order, he'd do some treatment at Youth Villages for four to ten months and he turns 17 and he's out in the community, and I'm just not at all confident that that is successful.
>
> So if I don't go that route then I have to look at the juvenile route: That would be Lincoln Hills.  It would either be Lincoln Hills, [under] a correctional order, he would be in the Serious Juvenile Offender Program until he's 22.  I'm not at all convinced that those services are going to address what's going on with [S.E.M.T.], and it's not going to give the level of supervision that he'll need.  I think the level of supervision needs to be longer than [until] he's 22.  We know adolescents['] brain development doesn't complete until 25.  [S.E.M.T.] has a lot of stuff going on inside of himself, and I think he's going to need to be supervised well past age 22.

¶15     **Alleged misunderstanding that Youth Villages treatment could last no more than 10 months.**  This particular sub-argument is unsupported.  The representative of Youth Villages testified unambiguously on direct examination that "the program can last anywhere from four to ten months," and when asked to

confirm the 4-10 month term on cross examination did so without qualification. On re-cross examination, the representative testified that it often takes longer for someone who has a cognitive delay to get through the Youth Villages program. However, so far as her testimony as a whole revealed, she meant only that such individuals tend to remain in the program closer to what she had already suggested was the maximum term of 10 months, as opposed to leaving the program earlier.

¶16 **Juvenile order limited to one year.** This sub-argument attempts to attach major significance to a small point. S.E.M.T. focuses narrowly on the circuit court's statement, reflected in the excerpt above, that a Youth Villages disposition would be under a one-year supervision order, which the court said would be too short to be "successful." S.E.M.T. points out that, under WIS. STAT. § 938.355(4)(am)1., generally speaking a dispositional order "made before the juvenile attains 18 years of age that places … the juvenile in [a] … residential care center for children and youth, … shall terminate on the latest of" dates that include the "date on which the juvenile attains 18 years of age," "unless the court specifies a shorter period or the court terminates the order sooner." S.E.M.T. turns 18 in July 2020. However, as the State points out and S.E.M.T. does not dispute, even if the court had decided on the day of its waiver decision (and not later) to send S.E.M.T. to Youth Villages for the maximum period allowed, this would have meant that the order could have extended slightly under 14 months. Further, more realistically, the court would likely not have issued its dispositional order until around July 1, 2019, for a maximum 380-day order. S.E.M.T. fails to persuade me that the differences at issue here constitute reliance by the court on a consequential inaccuracy.

¶17 **No basis to think that treatment available in adult system would be more effective than treatment in juvenile system.** This sub-argument is not a

claim that the court relied on inaccurate information. Instead, it effectively rests on the unsupported premise that a court weighing pertinent waiver considerations commits clear error whenever the court fails to make findings that the waived juvenile would receive longer, higher quality treatment in the adult system than in the juvenile system. As quoted above, however, WIS. STAT. § 938.18(5)(c) directs courts to attempt to evaluate "[t]he adequacy and suitability of facilities, services and procedures available for treatment of the juvenile and protection of the public *within the juvenile justice system*." (Emphasis added). And, this is only one set of considerations, to be weighed in the court's discretion in a rational process along with all other pertinent facts.

¶18    The court here explained why it reached the conclusion that there are not adequate and suitable services for S.E.M.T. in the juvenile system, which is the explicit topic of WIS. STAT. 938.18(5)(c). S.E.M.T. fails to explain why this was not a reasonable application of the paragraph (5)(c) considerations.

¶19    Further, as the State also points out, there was testimony supporting a finding that S.E.M.T. might receive meaningful treatment in the adult system, albeit of unknown timing and duration. S.E.M.T. suggests that this is not sufficient because the State failed to elicit evidence of a guarantee that such treatment would last longer than the 10 months that the Youth Village program might last. However, S.E.M.T. fails to support an argument that the court's approach was fatally flawed for lack of any such guarantee.

¶20    Stepping back regarding this sub-argument, S.E.M.T. identifies one basis, depending on the circumstances, that a juvenile could rely on to attempt to convince a circuit court that waiver is not appropriate. Indeed, such an argument was suggested to the circuit court here by S.E.M.T.'s counsel. Counsel argued

9

that S.E.M.T. needed to go to Youth Village, "a setting he's never been in before, which is a 24 by seven, therapeutic environment," and suggested that this would give him access to treatment that was far superior to any he could receive in the adult system. In theory, this argument could have informed a decision by the circuit court here to deny, not grant, the waiver petition. However, to repeat, S.E.M.T. fails to explain why the circuit court committed clear error in granting the waiver petition despite the absence of evidence that S.E.M.T. is guaranteed long, high quality treatment in the adult system—other factors could have outweighed this potential consideration.

### B. IQ & Premeditation

¶21    S.E.M.T. argues that the court committed clear error in appearing to credit expert testimony that S.E.M.T.'s alleged conduct was premeditated and not merely impulsive, despite the fact that the court also found that S.E.M.T. has an IQ measured at 63. *See* WIS. STAT. § 938.18(5)(b) (listing as waiver factor commission of offense in premeditated manner). S.E.M.T. contends that the court should have determined that, at an IQ this low, premeditated wrongdoing could not have occurred. This argument depends on S.E.M.T.'s interpretation of isolated pieces of the record that the circuit court was not obligated to accept and I reject the argument on that basis.

¶22    The argument is based primarily on testimony given at the waiver hearing by Dr. Anna Salter, a clinical psychologist who specializes in sexual abuse cases. After reviewing 400 pages of documents in the case, including police reports, but without interviewing S.E.M.T., she testified to the conclusion that his alleged conduct was premeditated. More specifically, she testified that the conduct alleged here "does not show the signs of a crime that is mitigated by

10

adolescent immaturity," but instead was "an adult-type attack, a home invasion and attack."

¶23 S.E.M.T. does not develop an argument that the court should not have admitted or could not rely on Dr. Salter's testimony in general. Instead, S.E.M.T. makes a specific argument based on the following facts: (1) Dr. Salter testified that she understood S.E.M.T. to have an IQ of 79, based on testing conducted in 2014; (2) she separately testified that offenders with IQ's "in the fifties and sixties" "often cannot consider future consequences of crime, they just can't think that far ahead"; (3) the circuit court made a factual finding, based on more recent testing, that S.E.M.T.'s "full scale IQ is only 63, long-term and visual memory is low, he's far behind in comprehension." Further, S.E.M.T. appears to assume, with good reason in the record, that the circuit court credited Dr. Salter's premeditation conclusion.[3]

---

[3] The court explained its waiver decision in part as follows:

> [Dr. Salter] testified that the alleged crime was not impulsive, that it involved planning and cover up, and the pornography on the phone of [S.E.M.T. portraying a] middle-aged woman in conjunction with the victim in this crime being a middle-aged woman reflect a paraphilia that we don't usually see in adolescent sex offenders.
>
> So [S.E.M.T.] has got a lot going on in terms of where he came from, what's going on inside of him.
>
> ….
>
> … This was a really serious, horrible rape. I mean I haven't seen cases like this in the years that I was [presiding] in criminal court…. And it involved, … oral sex, it involved vaginal sex, it involved threats to kill her, it involved having a weapon, climbing in through the woman's window in the middle of the night.

(continued)

11

¶24 With that additional background, S.E.M.T.'s argument is that, given the court's finding that S.E.M.T.'s IQ is only 63, the court "should have placed little weight on Dr. Salter's" conclusion of premeditation. Putting aside other potential problems with this argument, it rests on a questionable interpretation of Dr. Salter's specific testimony that persons with IQs "in the fifties and sixties" "often cannot consider future consequences of crime, they just can't think that far ahead." The questionable interpretation is that this testimony is necessarily inconsistent with her testimony that the documents she reviewed reflected premeditation. Certainly, the circuit court was not obligated to interpret this specific testimony as S.E.M.T. now interprets it.

¶25 First, "often cannot consider" does not mean "always cannot consider." That is, Dr. Salter did not testify that all persons with an IQ of around 63 are incapable of "consider[ing] future consequences of crime[s]."

¶26 Second, a juvenile's inability to "consider future consequences of [a] crime" may be related to, but is not equivalent to, an inability to plan and execute a crime. As a matter of common experience, a young or cognitively limited person might lack the capacity to think through various "future consequences" of conduct that he or she is still capable of planning and executing.

---

And the fact that he knew her, that he'd been to the house before demanding money that the son owed. The first thing he said to her, if this is all true, and obviously that there would have to be a trial, but I'm assuming that it's true was, ["B]itch, where's the money?["] And then to go ahead and rape her like that, that to me for a 16-year-old is incredibly serious and disturbing and concerning.

12

¶27     Third, as the State points out, this narrow argument overlooks important aspects of Dr. Salter's testimony as a whole, which provided independent bases for the circuit court to credit her conclusion of premeditation. Notably, S.E.M.T. fails to take into account detailed testimony by Dr. Salter explaining why she concluded that specific alleged acts of S.E.M.T. (*e.g.*, ordering the victim not to look at his face during the sexual assaults) point toward a conclusion of premeditation.

## CONCLUSION

¶28     For these reasons, I reject the two arguments raised on appeal, and conclude that the circuit court properly exercised its discretion in determining that clear and convincing evidence establishes that it is contrary to the best interests of the juvenile or the public for the case to proceed in juvenile court.

*By the Court*.—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.